**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| DANIEL WERLEIN, | ) |
| | ) |
|        Plaintiff, | ) |
| | )    No. 3:04-0911 |
| v. | )    JUDGE ECHOLS |
| | ) |
| BRINK'S HOME SECURITY, INC., | ) |
| | ) |
|        Defendant. | ) |

## MEMORANDUM

Presently pending before the Court is Defendant Brink's Home Security, Inc.'s Motion for Summary Judgment (Docket Entry No. 10), and Motion and Supporting Memorandum to Strike Declaration of Jennifer Curley (Docket Entry No. 29), to which the Plaintiff, Daniel Werlein, a former Brink's employee, has responded in opposition.

Werlein claims Brink's wrongfully terminated his employment after he reported the sexual harassment of female employees. On August 27, 2004, Werlein filed suit against Brink's in the Circuit Court for Davidson County asserting claims for retaliatory discharge under the Tennessee common law and the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, and for negligent retention and intentional infliction of emotional distress. Because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, Brink's removed the case to federal court on October 7, 2004.

1

## I. <u>FACTS</u>

Brink's sells residential security systems. Werlein began employment with the Nashville office of Brink's as a Security Sales Consultant ("SSC") on June 11, 2001. He was responsible for marketing and selling security systems to customers. His immediate supervisor was the branch General Manager, Ginger Mynatt. She in turn was supervised by Charles Fisher, Regional Director for the North Central Region. Other SSCs who were employed at the Nashville office during various times included Dewayne Tinker, Richard Sparks, Luke Finke, Jack Dinwiddey, and Amanda Wahl. Werlein was the only SSC in the office in 2002. Joey Spresser, the Technical Manager, supervised workers who installed security systems. Kara Van Sickle was the office assistant.

The SSCs worked on commission, and they were required to meet minimum monthly sales performance standards. The Nashville office was considered an "Alpha" branch. This meant each SSC was required to achieve a total of seventeen (17) installations per month. These installations resulted from a combination of company leads and self-generated sales. The parties dispute whether, in 2003, the SSCs were required to self-generate eight (8) or ten (10) of the monthly sales. In 2004, Brink's changed its policy and SSCs were evaluated based on their overall sales efficiencies for each month.

Brink's maintained a policy that, if an SSC did not meet his minimum sales goals for the month, the General Manager would place him in Training Status for 30 days. If the SSC did not

2

significantly improve sales performance in the next month, he could be placed on Corrective Status. If the SSC did not show significant improvement the next month, he faced further disciplinary action, such as remaining on Corrective Status or termination. If the employee's performance improved, he would be shifted to Training Status the next month and completely off disciplinary status if he continued to improve.

The parties disagree about the course and materiality of events that occurred in 2002 and 2003. According to Werlein, he was an outstanding SSC who was a top producer in the company and received many honors and awards. He achieved the company's "Ring of Honor" within his first six months of employment, and at one point he ranked twenty-first in sales among SSCs nationally. (Werlein Depo. at 67, 187.) Between June 2001 and May 2003, Werlein was not disciplined in any way. In his June 2002 performance evaluation, Mynatt noted that Werlein exceeded full performance and that he had a positive attitude. She made several suggestions for improvement, including that, "[t]o help Dan get his [self-generated leads] to a minimum of 10 or more per month, he needs to do a [better] job utilizing the daily success plan and his 72 hour planner." (Defendant's Appendix 12.) Starting in 2002, Mynatt had the SSCs play children's games, like "Ants in the Pants," during Monday meetings. While these games may have been intended to be motivational, team building exercises, the SSCs found them humiliating and childish, and Werlein did not want to participate.

3

Werlein claims the company's attitude toward him changed after he reported by telephone call to Jim Little, the Senior Vice President of Human Resources, in May 2003 that Joey Spresser was sexually harassing Kara Van Sickle, who was about twenty-five years of age.[1]  Werlein testified he had previously witnessed sexual harassment of female employees and had approached Spresser and told him to stop it.  Spresser told him to mind his own business. (Werlein Depo. at 119-120.)  Werlein told Mynatt about the sexual harassment of Van Sickle and asked her to correct it.  Werlein told Mynatt that if she did not take care of the problem, he would call Human Resources.  (Mynatt Depo. at 23-24.)  Werlein apparently believed that Mynatt did nothing to correct the problem and that she did not report the matter to Human Resources in accordance with company policy.  Mynatt testified she talked with Spresser and Van Sickle and thought the issue was resolved.  (Mynatt Depo. at 29-35.)

Spresser's sexual harassment of Van Sickle continued and in May 2003 Van Sickle asked Werlein and Tinker for assistance in stopping Spresser's behavior.  Werlein, Tinker, and Sparks, all SSCs, discussed the situation, and Werlein also discussed the situation with other technicians in the office.  No one told him that he should not report the conduct to Human Resources.  Werlein

---

[1]The record is not entirely clear whether Spresser also sexually harassed Mynatt or whether Spresser and Mynatt engaged in consensual but inappropriate conduct.  (Werlein Depo. at 71-72, 115-116; Mynatt Depo. at 41; Tinker Depo. at 80.)  In any event, Brink's does not dispute for purposes of summary judgment that sexual harassment occurred in the workplace.

4

thought he could cause himself "a lot of grief" by reporting the harassment. (Werlein Depo. at 123-124.) He asked his daughters and daughter-in-law, who work for Fed Ex, Comcast and a cosmetics company, for advice and they urged him without hesitation to report the sexual harassment, not only to protect Van Sickle, but the company as well. (Werlein Depo. at 126-128.) Werlein felt it was his duty to report the sexual harassment and he agreed to take the lead on making a report.

Sometime in late May or early June 2003, Werlein placed a call to James Little of Human Resources and reported the sexual harassment, believing that the company would follow its sexual harassment policy not to retaliate against him for making a report, would keep his identity confidential, and would support his efforts.[2] At the conclusion of the call, Little told Werlein his call would be kept confidential.

Werlein received his annual performance evaluation from Mynatt on June 10, 2003. While Mynatt rated Werlein's performance at a high level, she noted that his sales performance was inconsistent when viewed monthly, he sometimes overstepped his boundaries, "he needs to watch how he communicates requests and handles deferring projects" and "his comments, demeanor, and attitude, either positive or negative, significantly influences the other SSCs. Dan needs to realize the impact that he has (both positively and

_____

[2]The policy states: "You can raise concerns and make reports without fear of reprisal. Employees who make reports of harassment or register complaints will have their reports or complaints held in confidence to the extent possible." (Defendant's Appendix 7.)

negatively) on the other SSCs and the morale of the branch."
(Defendant's Appendix 14.)

On June 17, 2003, Little and Fisher visited the Nashville
office unannounced to investigate the sexual harassment
allegations. (Werlein Depo. at 126.) They spoke with Mynatt,
Spresser, and Van Sickle, and concluded that inappropriate behavior
had occurred. They issued a final written warning to Spresser for
his conduct. They also issued a final written warning to Mynatt
for her failure to prevent the conduct from occurring. Spresser,
Mynatt and Van Sickle signed statements agreeing to keep the
investigation confidential.

Thereafter, according to Werlein, Mynatt was "on a witch
hunt." (Werlein Dep. at 114.) She came down on Werlein and the
other two SSCs with both feet after the visit by upper management.
(Tinker Depo. at 38, 40, 43-44, 46-48, 81.)

On June 27, 2003, Mynatt gave Plaintiff a written warning for
"demeaning" and "condescending" remarks to a customer. She began
requiring all of the SSCs to check in with her every day, and she
called their cell phones to keep tabs on them. During sales
meetings, Mynatt made comments like, "if our sales don't increase,
there's going to be some changes in the office, and if I have to
leave, there will be additional people who will leave with me,"
"you made your own bed, you lie in it," "you guys are going to cost
me my job." (Tinker Depo. at 22; Werlein Depo. at 93-96, 110.) At
times sales meetings would include "having a positive attitude in
the workplace" and the main office staff, Mynatt, Spresser and Van

6

Sickle, would joke with the employees about not being positive. As a result, Van Sickle hung a negative smiley face sign in the office.

Mynatt started giving a "cry baby doll" weekly to the SSC who had the most company-generated and the lowest self-generated sales leads. She insisted that the SSCs work home shows and other community events nearly every weekend, although they were not paid for their time spent attending such shows.

Mynatt placed Werlein and other SSCs on Training and Corrective Status more often during the months after the sexual harassment report. They all started getting "write-ups." Placement on Training and Corrective Status continued from October 2003 to February 2004, even though those are slow sales months.

Brink's does not dispute that at some point Mynatt learned that Werlein made the call to Little. Mynatt also knew that two other SSCs, Tinker and Sparks, were involved in the decision to make the call. (Werlein Depo. at 95.) Mynatt stated to Werlein, "I know you (referring to the plural) were the ones that reported me." (Werlein Depo. at 91.) During a telephone conference call between Mynatt, Werlein, and Fisher, Mynatt asked Werlein point-blank if he was the individual who called in the complaint to Human Resources. Fisher did not object to Mynatt making such an inquiry. Fisher told Werlein that his words had more meaning than those of other people in the office and that he was disruptive. (Id. at 106-107.)

7

According to Werlein, Mynatt scheduled his company appointments too close together or too far apart and required Werlein to travel across town from one appointment to the next. (Werlein Depo. at 193.) As managers, Mynatt and Spresser were able to manipulate the scheduling of installations and thereby affected Werlein's performance numbers for the month, causing him to be placed on Training or Corrective Status. Manipulation of the installations also affected Werlein's commissions because he did not get paid until the customers' systems were installed. (Werlein Depo. at 110, 173, 282; Tinker Depo. at 84-86.) Werlein claims that Mynatt at times wrote lines through his self-generated business on pay sheets and changed them to company business, thereby affecting his sales performance. (Werlein Depo. at 283-284, 288, 307-308; Plaintiff's Appendix 4, Werlein Decl. ¶ 16.)

From Mynatt's point of view, however, she had the authority to hire, fire, and discipline SSCs at the Nashville branch and to make sure they met their target sales numbers. Throughout Plaintiff's employment, she held one-on-one meetings with SSCs and used daily success plans to help them meet their sales goals. In 2001 and 2002 her management style was relaxed and accommodating. She occasionally required the SSCs to work home shows to generate sales leads. If an SSC made a sales presentation but failed to make a sale, Mynatt called the customer to "rehash" the presentation to learn why Brink's did not obtain the sale and to find ways the SSC might improve. In 2002 Mynatt began meeting with all of the SSCs each Monday. She also implemented Monday call nights and use of

8

the children's games.  In late 2002 and January 2003 Mynatt had her staff working long hours.

According to Brink's, in mid to early May, 2003, Fisher reviewed the Nashville branch's performance and noted that the SSCs were not achieving the sales figures required of an Alpha branch. Fisher knew that Mynatt tried to foster a friendly work environment and he knew she tended to be friendly and accommodating toward her staff.  Thus, in May 2003, Fisher traveled to Nashville to counsel Mynatt about her managerial skills.  He told her she needed to do a better job of managing her SSCs to ensure they reached their target sales numbers and performed in accordance with company standards.  Fisher also instructed Mynatt to be more strict with her staff and to do a better job of holding the SSCs accountable for their failures to meet sales targets, including the use of disciplinary action for poor sales performance.

During the investigation into the sexual harassment allegations the next month, June 2003, Fisher told Mynatt that, although he had counseled her previously about her informal management style, she continued to be too accommodating to her staff.  He once again advised that her style was too informal and that, to raise her branch's sales numbers and avoid further complaint of inappropriate behavior, she needed to be strict with all branch employees with regard to conduct and behavior.  As a result of Fisher's remarks, Mynatt knew she needed to improve her management style immediately or face further disciplinary action and/or termination herself.  Thereafter, she became less

9

accommodating and more strict.  She began a more concerted effort
to hold the sales staff accountable for performance.

Mynatt claims that she observed as early as Werlein's 2002
performance evaluation that his sales performance varied from month
to month and that he needed to be more consistent in achieving his
sales goals.  (Mynatt Depo. at 61.)  She placed Werlein on Training
Status in May 2003 based on his sales performance in April 2003.
In the June 10, 2003 annual performance evaluation, Mynatt noted
Werlein's disagreements with others and, at times, his negative
attitude.    She  again  commented  on  his  inconsistent  sales
performance, noting he would have "one or two good months and then
one or two bad months."  (Defendant's Appendix 14.)

Sometime after May 2003 Mynatt placed Werlein on final written
warning  for  having  inappropriate  conversations  with  his  co-
employees, but Brink's is unable to produce this written warning.
(Mynatt Depo. at 70-71.)   Werlein denies that he was placed on
final written warning.    Mynatt also placed Werlein on Training
Status in August 2003, moved him to Corrective Status in September
and October 2003, moved him back to Training Status in November and
December 2003, again moved him to Corrective Status in January
2004, and moved him again to Training Status in February 2004.
(Id. at 72.)  Mynatt noted in monthly reports to Fisher that, while
Werlein  was  improving,  his  attitude  was  poor.    (Defendant's
Appendix 15.)  Werlein continued to receive quarterly bonuses and,
in January 2004, he received the Ring of Honor Diamonds award after

10

his total 2003 sales exceeded $250,000. On at least two occasions, Fisher spoke to Werlein personally about his disruptiveness.

In March 2004, Werlein had an excellent sales month. Spresser told Werlein that "he wasn't going to have another sales install month like he had in March." (Werlein Depo. at 214.)

During the first week of April, Mynatt terminated the employment of SSC Richard Sparks. She assigned the remaining two SSCs, Werlein and Tinker, to work on Thursday and Friday at the Southern Women's Home Show. (Werlein Depo. at 111.) Werlein was late for his shift at the Southern Women's Home Show. Tinker covered for Werlein, who stopped at the office to pick up more promotional bags and materials to hand out to potential customers at the show. Werlein told Mynatt the materials were running low and she told him where he could locate more at the office. She also instructed Van Sickle to cut keys for Werlein to Brink's new office.

On Saturday and Sunday, Werlein was assigned to work the Kids Fair. According to Werlein, he arrived early before the Kids Fair was open to the public on Saturday morning. His daughter, son-in-law and others helped him unload his vehicle. Werlein found that the Brink's booth had not been properly set up (which usually was Spresser's job), and there were no chairs or promotional materials available. Werlein left the fliers he had with him and drove to the office in Brentwood to pick up more supplies for himself and for Tinker, who was working a shift at the Southern Women's Home Show. Werlein dropped off supplies for Tinker and then returned to

11

the Kids Fair one hour past his scheduled time. (Tinker Depo. at 66.) He did not call Mynatt to notify her that he would be late. When he returned, Mynatt was waiting at the Brink's booth and questioned Werlein about his whereabouts. Mynatt testified, however, that she called Werlein when she did not find him at the Brink's booth and he was at home making flight arrangements for his wife.

Werlein's daughter, Jennifer Curley, attests that she, her husband, and her son arrived at the Kids Fair early with their costuming group. Werlein arrived shortly thereafter, but the Brink's booth was not set up and there were no chairs or tablecloths. Werlein indicated he was going to the office in Brentwood to pick up supplies, so she and her nine-year-old son watched the Brink's booth and the brochures Werlein had brought with him. After a short while, Curley's son returned to the booth Curley was manning and said that a lady was at Werlein's booth and she had "kicked [him] out." Curley returned to the Brink's booth and observed a woman pulling tables together and organizing the brochures. When Werlein returned, he introduced Curley to the woman, who was Ginger Mynatt. (Plaintiff's Appendix 3, Curley Decl. at ¶¶ 4-18.)

Mynatt terminated Werlein the following Tuesday, April 6, for being late to the two exhibitions the prior week while he was on final written warning. Werlein was not on Training or Corrective Status at the time of his termination. Werlein has not received

12

any treatment or counseling for emotional or mental problems. Brink's subsequently terminated the employment of Mynatt.

## II. **STANDARD OF REVIEW**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In

13

ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. **ANALYSIS**

### A. **Motion to Strike Declaration of Jennifer Curley**

Brink's first seeks to strike the Declaration of Jennifer Curley on the ground that Werlein failed to disclose the witness during pretrial discovery. Werlein admits he inadvertently failed to disclose Curley's name after he learned the alleged ground for his termination was his tardiness to the home shows, but he contends Brink's knew, because of his own deposition testimony, what Curley would say if she were called as a witness, and therefore, the error is harmless. See Fed.R.Civ.P. 37(c)(1) advisory committee's note (1993); Roberts v. Galen of Virginia, Inc., 325 F.3d 776, 782 (6th Cir. 2003) (commentary strongly suggests a harmless violation involves honest mistake of party coupled with sufficient knowledge of other party).

Werlein's deposition testimony reveals he explained to Brink's that his daughter, whom he did not identify by name, and others helped him unload his car before the Kids Fair opened and that his daughter placed the flyers Werlein had brought with him on the Brink's table while Werlein drove to the office to pick up more supplies. (Docket Entry No. 32-2, Werlein Depo.) The Court finds that, while Werlein should have supplemented his supplemental disclosures and discovery responses to reveal his daughter's name,

14

Brink's nonetheless knew of Curley's involvement in the case and could anticipate the substance of the testimony she provided by Declaration. Werlein's error is harmless, <u>see</u> <u>Roberts</u>, 325 F.3d at 782, and the Motion to Strike will be DENIED.

## B. Retaliatory discharge

With regard to the claim of retaliatory discharge for reporting sexual harassment, Brink's first contends that Werlein's exclusive remedy is the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, citing <u>England v. Fleetguard</u>, 878 F. Supp. 1058, 1064-1065 (M.D. Tenn. 1995). In <u>England</u>, the district court ruled that the THRA does not allow recovery for punitive damages and that the THRA was plaintiff's exclusive remedy for religious discrimination in the workplace. <u>Id.</u> Thus, the court declined to allow the plaintiff in <u>England</u> to amend his complaint to add a common-law claim of retaliatory discharge in order to seek punitive damages. <u>Id.</u> at 1059.

In this case, Werlein filed suit seeking recovery under the TPPA and the common law under the theory that his whistleblowing activity resulted in the termination of his employment. Tennessee's statutory and common-law tort causes of action for whistleblower retaliation are directed toward employer conduct that is different in kind from the prohibited discrimination and retaliation that is at the heart of the THRA. <u>See</u> <u>Chism v. Mid-South Milling Co.</u>, 762 S.W.2d 552, 555 (Tenn. 1988) (observing essence of public policy exception to at-will employment is that employee may claim damages for retaliatory discharge when

15

motivating factor for discharge violates clear public policy evidenced by unambiguous constitutional, statutory or regulatory provision).  Although the THRA was adopted in 1978, the Tennessee Supreme Court found it necessary in 1988 to prohibit termination of an at-will employee in contravention of well-defined and established public policy, see Chism, 762 S.W.2d at 555, and the Tennessee General Assembly adopted the TPPA in 1990.

Moreover, since the England case, the Tennessee Supreme Court has ruled that the statutory "whistleblower" claim for retaliatory discharge under the TPPA does not preempt the similar common-law tort claim and that both a statutory and a common law claim may be pursued.  Guy v. Mutual of Omaha Ins. Co., 79 S.W.3d 528, 531 (Tenn. 2002).  Guy confirms the state's commitment to providing an at-will employee with adequate avenues of redress if he is discharged from employment against public policy for reporting illegal or unethical activity.  Brink's has not cited a Tennessee state or federal case which specifically holds the THRA preempts any claim that may be brought under the TPPA or the common law, and the Court has not located such a case.  Accordingly, in light of Tennessee's strong support of a public policy exception to at-will employment in the TPPA and the common law, the Court concludes that Werlein's Complaint, alleging both a TPPA and a common-law claim, is not preempted by the THRA.

Next, Brink's contends that Werlein cannot meet his *prima facie* burden of proof under the TPPA or the common law.  Brink's asserts that Werlein cannot show he faced a real threat of

16

dismissal such that he was required to choose between his job and making the report of sexual harassment, and he cannot show a causal connection existed between his report and his termination.

The elements of the common-law claim for retaliatory discharge are: (1) an employment-at-will relationship existed; (2) the employee was discharged; (3) the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. Crews v. Buckman Lab. Int'l, Inc. 78 S.W.3d 852, 862 (Tenn. 2002). While the statutory claim has similar elements, it increases Werlein's burden of proof to show his whistleblowing activity was the sole reason for his termination, rather than a substantial factor in his termination. Guy, 79 S.W.3d at 537; Voss v. Shelter Mut. Ins. Co., 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997). The statutory cause of action also protects employees from discharge for refusing to remain silent about the existence of illegal activities at their places of employment. Mason v. Seaton, 942 S.W.2d 470, 475 (Tenn. 1997).

Brink's contends Werlein cannot show that his employer instructed him to remain silent about illegal activity, Werlein consulted his family and was encouraged to report the sexual harassment "without hesitation," and Werlein made his report

17

without fear of confrontation and with the expectation that the company would be supportive of him, even though he anticipated he would experience "a lot of grief." Brink's contentions fail. First, there is no requirement under Tennessee law that Werlein show his employer instructed him to remain silent and refrain from reporting illegal activity. <u>See</u> <u>Voss</u>, 958 S.W.2d at 344; <u>Mason</u>, 942 S.W.2d at 475-476. Second, the encouragement of Werlein's family members to report the sexual harassment has no bearing on how Brink's reacted to Werlein after he made the report. Third, Brink's misconstrues Werlein's testimony. In essence, Werlein testified that, while he thought he could cause himself "a lot of grief" by making the report, he felt it was his duty to make the report, and he believed in the letter and spirit of Brink's sexual harassment policy that he could make the report and not be subject to identification, confrontation, or reprisal. While he made the report expecting the company to be supportive of him, Werlein testified Brink's did not follow its own policy and did not treat him in a supportive manner.

Brink's further contends Werlein has not shown that his report of sexual harassment was the sole or a substantial factor in his discharge ten months later, citing <u>e.g.</u>, <u>Clark County Sch. Dist. v. Breeder</u>, 532 U.S. 268, 273 (2001) (finding twenty months too long a period of time to raise inference of causation); <u>Haywood v. Lucent Technologies, Inc.</u>, 323 F.3d 524 (7th Cir. 2003) (one year deemed to long to establish causal connection). Moreover, Brink's suggests, it had a legitimate, non-retaliatory reason for

18

discharging him when he failed to show up on time for his shifts at the Home Show and the Kids Fair while he was on final written warning.

The Court concludes that Werlein has generated a genuine issue of material fact on the issue of causation to survive the summary judgment motion. Taking the facts in the light most favorable to Werlein, as the Court must on summary judgment, a reasonable jury could determine that Brink's retaliated against Werlein for reporting sexual harassment. Within days after the report, Mynatt disciplined Werlein for an incident involving a customer. She began "coming down" on Werlein and the other SSCs involved in the report by checking their whereabouts and placing them on Training and Corrective Status more often than in the past. She implemented use of a "cry baby doll," supposedly to humiliate the SSC with the most company sales leads. While Werlein's monthly sales performance may have been inconsistent, Werlein was a top producer in the company when his annual sales were taken into account. He won performance awards and received excellent performance evaluations until he made the report. Thereafter, Mynatt reported to Fisher that Werlein had a negative attitude. She placed him on final written warning for troubling his co-employees with telephone calls, but Brink's has not been able to produce that final written warning. She terminated Werlein for being late to the Home Show and the Kids Fair, although the parties dispute the events that transpired on those days. Werlein was not on Training or Corrective Status when he was terminated. While Brink's may

19

ultimately succeed in convincing a jury that Werlein was terminated for a non-retaliatory, non-pretextual reason, the Court concludes that a jury must decide the disputed issues of material fact. Therefore, the Motion for Summary Judgment on the retaliatory discharge claim will be DENIED.

## C. Remaining state-law tort claims

Brink's contends that Werlein's claims for negligent retention of Ginger Mynatt and intentional infliction of emotional distress are preempted by the Tennessee Worker's Compensation Act, Tenn. Code Ann. §§ 50-6-101, *et seq.* Brink's also alleges that Werlein cannot show the type of outrageous conduct prohibited by the tort of intentional infliction of emotional distress, nor can he show that he has suffered a severe mental condition as a result of any such outrageous conduct.

The Court concludes that the negligent retention claim is barred by the Worker's Compensation Act.[3]  See <u>Curtis v. G.E. Capital Modular Space</u>, 155 S.W.3d 877, 882 (Tenn. 2005) (noting worker's compensation system operates to provide quick compensation to injured workers in exchange for immunizing employers from tort liability and limiting damages); <u>Anderson v. Save-A-Lot, Ltd.</u>, 989 S.W.2d 277, 279-280 (Tenn. 1999) (canvassing Tennessee law barring employees from asserting tort claims for accidental injuries arising out of and in the course of employment); <u>Donnell v. Kohler</u>

---

[3]Werlein responds to the issue by contending his whistleblower claim is not preempted by the Worker's Compensation Act. (Docket Entry No. 20, Memorandum at 18-19.) Such a response does not address whether the negligent retention claim is barred.

<u>Co.</u>, 2005 WL 3071784 (W.D. Tenn. 2005) (recognizing employee's common law negligence claim against company would be "revolutionary" in sense that it would at least implicitly approve of new exception to exclusivity provision of Worker's Compensation Act without explicit guidance from Tennessee courts). As to the intentional infliction of emotional distress claim, Werlein might be able to show actual or deliberate intent to injure in order to establish Brink's common law liability outside of the Worker's Compensation Act. See <u>Gonzales v. Alman Constr. Co.</u>, 857 S.W.2d 42, 45 (Tenn. Ct. App. 1993); <u>Mize v. Conagra, Inc.</u>, 734 S.W.2d 334, 336 (Tenn. Ct. App. 1987). However, Werlein has not produced evidence to meet an essential element of the intentional tort. He has not shown that Brink's conduct was "so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society[.]" <u>Newsom v. Textron Aerostructures</u>, 924 S.W.2d 87, 98 (Tenn. Ct. App. 1995). Accordingly, the Motion for Summary Judgment on these claims will be GRANTED.

## IV.   <u>CONCLUSION</u>

For all of the reasons stated, Defendant's Motion for Summary Judgment shall be GRANTED IN PART and DENIED IN PART. Werlein has generated genuine issues of material fact on his retaliatory discharge claims under the TPPA and the common law. However, his negligent retention claim is barred by the Worker's Compensation Act, and he fails to establish an essential element of the tort of intentional infliction of emotional distress. Brink's Motion to

21

Strike the Declaration of Jennifer Curley will be DENIED.  The case will proceed to final pretrial conference and jury trial as previously scheduled.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE